IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

KEVIN MURCHISON,

*Defendant*.

Criminal Action No. ELH-17-0232

**MEMORANDUM OPINION**

Defendant Kevin Murchison, who is self-represented, filed a "Motion For Compassionate Release Pursuant To 18 U.S.C. § 3582(C)(1)(A) And The First Step Act." ECF 516 (the "Release Motion"). The Release Motion is supported by exhibits.

Additionally, Murchison moved the Court for appointment of counsel to assist him in litigating the Release Motion. ECF 517 (the "Appointment Motion"). Thereafter, the Federal Public Defender declined to represent the defendant. ECF 531.

The government opposes the Release Motion. ECF 550. It has also submitted exhibits. Defendant has not replied and the time to do so has expired.

No hearing is necessary. For the reasons that follow, I shall deny the Release Motion and the Appointment Motion, without prejudice.

## I.      Procedural and Factual Background

A grand jury in the District of Maryland returned a Superseding Indictment against Murchison and ten codefendants on June 6, 2016. ECF 20. In a Second Superseding Indictment (ECF 93), defendant was charged in Count One with conspiracy to distribute and possess with intent to distribute one kilogram or more of a substance containing heroin; a substance containing a detectable amount of fentanyl; and 500 grams or more of a mixture containing cocaine, in

violation of 21 U.S.C. § 846.  *Id.*  And, in Count Seven he was charged with possession of cocaine on May 19, 2017, with the intent to distribute it.

Pursuant to a Plea Agreement (ECF 302), defendant entered a plea of guilty on June 5, 2018, to Count One of the Second Superseding Indictment, charging conspiracy to distribute one kilogram of heroin.  ECF 299.  The offense carried a mandatory minimum term of imprisonment of ten years, with a maximum of life imprisonment.  ECF 302, ¶ 3(a).  Under Fed. R. Crim. P. 11(c)(1)(C), the parties agreed to a sentence ranging from 120 months to 144 months of imprisonment.  *Id.* ¶ 8.

The Plea Agreement included a stipulation of facts.  *Id.* ¶ 6(a).  According to the factual stipulation, beginning in at least September 2016, defendant conspired with others to obtain and distribute one kilogram or more of heroin at a "street-level drug 'shop'" in Baltimore.  *Id.*  Law enforcement recorded conversations between the defendant and coconspirators as well as sources of supply.  *Id.*  Defendant was also captured on video processing suspected controlled substances. *Id.*  And, cocaine was recovered during the execution of a search warrant at defendant's residence. *Id.*

In the Plea Agreement, the government took the position that defendant qualified as a Career Offender under § 4B1.1(a) of the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.").  *Id.* ¶ 6(b).  Moreover, the parties stipulated to a base offense level of 32 based on the drug quantity of more than three kilograms of heroin but less than ten.  *Id.*; *see* U.S.S.G. § 2D1.1(c)(5).  If defendant were a Career Offender, as the government claimed, his offense level would increase to 37.  *Id.*

Sentencing was held on October 26, 2018.  ECF 427.  According to the Presentence Investigation Report ("PSR", ECF 431), the defendant was 39 years old.  *Id.* at 3.[1]  He had neither a high school diploma nor a GED.  *Id.*

Pursuant to the PSR, the defendant qualified as a Career Offender.  *Id.* ¶¶ 23, 45.  After three deductions for acceptance of responsibility, the PSR reflected a final offense level of 34.  *Id.* ¶ 26.  Defendant had 15 criminal history points.  That established a Criminal History Category of VI.  *Id.* ¶ 44.  Alternatively, defendant had a Criminal History Category of VI under U.S.S.G. § 4B1.1(b).  *Id.* ¶ 45.

Based on a final offense level of 34 and a Criminal History Category of VI, defendant's advisory sentencing Guidelines called for a sentence ranging between 262 months and 327 months of imprisonment.  *Id.* ¶ 100.  However, as noted, the "C Plea" called for a sentence ranging from 120 months to 144 months.  And, the Court imposed a sentence of 120 months' imprisonment.  ECF 429 (Judgment).  That corresponded to the bottom of the C plea range and to the mandatory minimum sentence.

Murchison submitted a request for his compassionate release to the Warden of Butner Medium II on October 2, 2020.  ECF 516-2 at 1. And, defendant avers that the Warden did not respond to his request for the following thirty days.  ECF 516 at 1-2.[2]

At the time of filing the Release Motion, defendant was serving his sentence at Butner Medium II in North Carolina.  *See* ECF 516-2 at 3, 5; ECF 518.  However, BOP records reflect that Murchison has since been transferred to FCI Fort Dix in New Jersey.  *Inmate Locator*,

---

[1] A prior iteration of the PSR was docked on August 2, 2018.  *See* ECF 377.  Thereafter, on October 26, 2018, an amended version of the report was submitted to the Court.  *See* ECF 431 at 1.

[2] Curiously, Murchison also submitted a letter from the Warden, in which the Warden denied a request for compassionate release as to another inmate.  ECF 516-2 at 10.

https://www.bop.gov/inmateloc/index.isp (last accessed April 18, 2022).  Accounting for the three months that defendant was in pretrial detention (ECF 431 at 1), Murchison has served about 45 months of his sentence, or approximately 37.5%.  According to the BOP, defendant has a projected release date of March 18, 2027.  *Inmate Locator*, https://www.bop.gov/inmateloc/index.isp (last accessed April 12, 2022).

Defendant has a history of health conditions, including Hodgkin's Lymphoma.  *Id.* at 1. As of August 13, 2021, his Body Mass Index ("BMI") was 36.3.  *Id.*  Defendant has also been vaccinated for COVID-19.  ECF 550-2 at 55.

The government does not contend that defendant failed to exhaust his administrative remedies.  But, it claims that defendant has failed to demonstrate an extraordinary and compelling reason for a sentence reduction.  ECF 550 at 11.  And, even if defendant is eligible for compassionate release, the government contends that release is not warranted under 18 U.S.C. § 3553(a).  *Id.* at 13.

## II.    Appointment Motion

As mentioned, Murchison asks the Court to appoint counsel for him to assist in litigating the Release Motion.  *See* ECF 517.  There is no constitutional right to appointed counsel in post-conviction proceedings.  *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The right to appointed counsel extends to the first appeal of right, and no further.").  Thus, the determination to appoint counsel in this context rests solely within the discretion of the district court.  *See United States v. Legree*, 205 F.3d 724, 730 (4th Cir. 2000) (explaining that a district court has the discretion to appoint defendant counsel under 18 U.S.C. § 3582(c) in exceptional circumstances).

Murchison argues that he should be appointed counsel in this case because he is a "layman to the law."  ECF 517 at 1.  Further, he notes that the prison in which he is incarcerated "is on

'lock-down[,]'" which has deprived him of access to the "law library to research and develop a reply to any response that may be filed by the government." *Id.* And, he claims that he has "made several attempts to obtain pro bono counsel," without success. *Id.*

In my view, defendant has ably demonstrated the ability to articulate the legal and factual basis of his claims. Further, a review of defendant's case does not reveal any exceptional circumstances that would warrant the appointment of counsel. Therefore, I shall deny defendant's request for the appointment of counsel, without prejudice.

### III.   Release Motion

#### 1.   Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Hargrove*, ___ F.4th ___, 2022 WL 905436, at *3 (4th Cir. Mar. 29, 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." 18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence, if "extraordinary and compelling reasons warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i); *see Hargrove*, 2022 WL 905436, at *3. This provision is an exception to the ordinary rule of finality. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was enacted as part of the Sentencing Reform Act of 1984. Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP. *See* Pub. L.

No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g*., *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. (Emphasis added). So, once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, he or she may petition a court directly for compassionate release. *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276. That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after

considering the factors set forth in section 3553(a) [of 18 U.S.C.] to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction; or

> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam); *see also Hargrove*, 2022 WL 905436, at *3; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission. Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. Moreover, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.

The Fourth Circuit has said that, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)). In § 1B1.13 of the United States Sentencing Guidelines ("U.S.S.G."), titled "Reduction in Term of

Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release. *See McCoy,* 981 F.3d at 276-77.[3]

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 App. Note 1(D). This is the "so-called, 'catch-all' category." *McCoy,* 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act. *McCoy,* 981 F.3d at 276. Of significance here, it is only "directed at BOP requests for sentence reductions." *Id.* (citing U.S.S.G. § 1B1.13). "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *Id.* at 282; *see also Jenkins,* 22 F.4th

---

[3] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

at 169; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).   In other words, the policy statement does not apply to the court.

Indeed, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 2022 WL 905436, at *3-4.   Consequently, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id*. at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 2022 WL 905436, at *6.   But, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, No. 21-6960, 2022 WL 127900, at * 1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *United States v. Harris*, No. 21-6781, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); 28 U.S.C. § 994(t). However, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *Harris*, 2022 WL 636627, at *1.

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.   However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.   Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to

compassionate release, U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 2022 WL 905436, at *3.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582.  *See, e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020).  And, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *Hargrove*, 2022 WL 905436, at *4; *High*, 997 F.3d at 186; *see also United States v. Butts*, No. 21-6380, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

As mentioned, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant.  *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 22 F.4th at 169.  Nevertheless, compassionate release is a "rare" remedy.  *White v.*

*United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

To be sure, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018) (passim); *High*, 997 F.3d at 187. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted).

## 2. COVID-19

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[4] Defendant filed his motion for compassionate release in November 2020. ECF 516. At the time, the nation was still "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it. *Id.*

---

[4] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration."). Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.

People who are stricken with the virus sometimes experience only mild or moderate symptoms.  But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus.  The risk factors initially identified by the CDC included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.  But, the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In February 2022, it updated its guidance to reflect the most available data.

*See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 25, 2022), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

As to the CDC's risk factors, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk conditions is too restrictive." *Hargrove*, 2022 WL 905436, at *4. In other words, for purposes of compassionate release, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at *5.

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus. *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high."). Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others. Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020). And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to

stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus.  *Seth*, 2020 WL 2571168, at *2.  Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected.  Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[5]

---

[5] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.).  On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19. *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020). Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281. In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General. *See* Pub. L. No. 116-136, § 12003(b)(2). On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ." *Hallinan*, 2020 WL 3105094, at *9. Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ." *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry

---

systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement. The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve. And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[6] Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders. But, the criteria for eligibility has since been approved for all persons five years of age and older. *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021, https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188. Approximately 66% of the total U.S. population is fully vaccinated, including 28% of people from ages 5 to 11, 59% of people from ages 12 to 17, 72% of people from ages 18 to 64, and 90% of people age 65 and up. *See How Vaccinations Are Going in Your County and State*, N.Y. TIMES, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Apr. 18, 2022).

Moreover, roughly 99.3 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 18 and older. *See id*.; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/coronavirus/2019-

---

[6] Questions as to the efficacy of the Johnson & Johnson vaccine were raised as to the Delta and Omicron variants. *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron -study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J.&J. Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y. TIMES (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

ncov/vaccines/booster-shot.html (last updated Apr. 15, 2022). And, federal regulators have recently approved a second booster dose for individuals age 50 and older. *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6.

The BOP reportedly received its first shipment of vaccines in December of 2020. Walter Pavlo, F*ederal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. As of April 18, 2022, the BOP had 135,398 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 346,586 vaccine doses to staff and inmates. *See* https://www.bop.gov/coronavirus/ (last accessed Apr. 18, 2022).

For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the

magnitude of the decline is its breadth: Cases have been declining in every region."). But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was found to be more virulent than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, both around the world and in the United States. It sparked further cause for concern, because it was highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases. *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.

Then, the number of COVID-19 cases again declined considerably. *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST

(Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.   And, the country generally has begun to return to normalcy.  But, once again, we have begun to experience an uptick in COVID-19 cases. *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.

As of April 18, 2022, COVID-19 has infected more than 80.6 million Americans and caused approximately 988,000 deaths in this country.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed Apr. 18, 2022).  And, as of the same date, the BOP reported that 53 federal inmates, out of a total population of 136,649, and 152 BOP staff, out of some 36,000 staff members, currently tested positive for COVID-19.  Moreover, 52,946 inmates and 12,545 staff have recovered from the virus.  In addition, 293 inmates and seven staff members have died from the virus.  The BOP has completed 128,782 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to FCI Fort Dix, where the defendant is imprisoned, the BOP reported that as of April 18, 2022, out of a total of 3,251 inmates, zero inmates or staff have tested positive, two inmates have died of COVID-19, and 1,552 inmates and 129 staff have recovered at the facility. In addition, 300 staff members and 2,811 inmates at the FCI Fort Dix complex have been inoculated with the vaccine.  *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/ftd/ (last visited Apr. 18, 2022).

### 3.  Discussion

The Release Motion indicates that Murchison has "complied with the statutory 'exhaustion' prerequisite of §3582(c)(1)(A)(i) by filing a request for compassionate release with

20

the Warden at his place of confinement . . . ." ECF 516 at 1; *see* ECF 516-2 at 1.  Further, defendant

argues that his underlying health conditions render him particularly vulnerable to COVID-19 and

thereby present an extraordinary and compelling reason for his release.   ECF 516 at 4-5; *see* ECF

516-2 at 3-8.  And, in defendant's view, the § 3553(a) sentencing factors weigh in favor of his

release.  ECF 516 at 6-7.

      I address each contention, in turn.

## A.

      As mentioned, a court may only consider a prisoner's motion for compassionate release if

the prisoner has "fully exhausted all administrative rights to appeal a failure of the BOP to bring a

motion on the defendant's behalf" or if 30 days have passed since the warden of a defendant's

facility received such a request.  18 U.S.C. § 3582(c)(1)(A).

      Defendant submitted a request to the Warden for compassionate release on October 2,

2020.  *See* ECF 516-2 at 1.  And, defendant avers that as of November 11, 2020, the date on which

he submitted the Release Motion to the Court (ECF 516 at 7), the Warden had yet to respond to

his request.  *Id.* at 1-2.  The government does not contest these assertions.  Thus, I am satisfied that

Murchison has exhausted his administrative remedies.

## B.

      In the Release Motion, Murchison contends that he has been "rendered particularly

vulnerable to COVID-19 by virtue of his afflictions with Hodgkins [sic] Lymphoma ('cancer');

hyperlipedemia [sic] ('high cholesterol'); fatty liver; obesity and pre-diabetes."  ECF 516 at 4.

And, defendant has provided the Court with medical records that indicate he has a history of

Hodgkin's Lymphoma.   *See* ECF 516-2-at 3-8.[7]   Further, medical records provided by the government reflect that defendant has a BMI of approximately 36.3, which would qualify him as obese.   *See* ECF 550-2 at 1.

As the government concedes (ECF 550 at 11), obesity and Hodgkin's Lymphoma are among the conditions that, according to the CDC, "can make you more likely to get very sick from COVID-19." *See Certain Medical Conditions, supra*.   In addition, the CDC cautions that "[a] person's risk of severe illness from COVID-19 increases as the number of underlying medical conditions they have increases."   *Id.*   Nonetheless, the government argues that Murchison's medical conditions no longer present an extraordinary and compelling reason for his release because he has been fully vaccinated against COVID-19.   ECF 550 at 11; *see* ECF 550-2 at 55.

It is without question that the COVID-19 vaccines effectively reduce the health risks posed by COVID-19.   But, the fact that Murchison has been fully vaccinated against COVID-19 "does not negate that his underlying health conditions make him eligible for compassionate release." *Spriggs*, 2021 WL 1856667, at *3; *see United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021) ("It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues.").

---

[7] Defendant also indicates that he has not received adequate medical care while incarcerated.   ECF 516 at 7.   But, having reviewed the voluminous medical records submitted by the government, it appears that defendant is in relatively good health and has received adequate medical attention.   *See*, *e.g.*, ECF 550-2 at 1-3 (providing that defendant was seen by BOP medical staff on August 13, 2021, for a preventive health visit, with a follow up visit scheduled for June 1, 2022).

In any event, if defendant wishes to challenge the conditions of his confinement, he may pursue that claim in a separate action, subject to any administrative requirements that may apply.

22

Moreover, as illustrated above, the trajectory of the COVID-19 pandemic has proven less than predictable.  The Court is mindful that the CDC has confirmed that breakthrough infections of COVID-19 among vaccinated individuals occur and, albeit in rare cases, they can result in death.  *See Rates of COVID-19 Cases and Death by Vaccination Status*, CNTRS. FOR DISEASE CONTROL,     Mar.     17,     2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed Apr. 13, 2022).  To that end, the CDC issued recommendations "encouraging everyone 16 and older to receive a booster shot" of an authorized COVID-19 vaccine.  *See CDC Expands COVID-19 Booster Recommendations to 16- and 17-year-olds*, CNTRS. FOR DISEASE CONTROL,     Dec.     9,     2021, https://www.cdc.gov/media/releases/2021/s1208-16-17-booster.html (last accessed Apr. 13, 2022).  And, the parties have not indicated whether Murchison has received a booster shot.

Further, several judges of this Court have concluded that an inmate is eligible for compassionate release, notwithstanding his vaccination status.  *See, e.g.*, *United States v. Hegie*, RDB-14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19 pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an extraordinary and compelling reason for his release); *United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan. 4, 2022) (explaining that vaccinated defendant who was a paraplegic and suffered from frequent urinary tract infections could satisfy the extraordinary and compelling prong of the analysis).

Accordingly, I am persuaded that Murchison's health conditions qualify him for compassionate release.

### C.

The finding that defendant's medical conditions render him eligible for compassionate release does not end the analysis.  Indeed, compassionate release is properly reserved only for "the most grievous cases," *McCoy*, 981 F.3d at 287, and the coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.).

Accordingly, even where a court finds extraordinary and compelling reasons for compassionate release, relief is appropriate under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).  *See High*, 997 F.3d at 186.   These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *Id.*

Concerning the severity of his offense, defendant points out that he is a non-violent drug offender and "the gravity of his crimes do not merit a death sentence."  ECF 516 at 6.  Thus, in his view, "the service of a sentence under the threat of COVID-19 is more punative [sic] than as originally imposed and intended by the Court."  *Id.* at 6-7.  In other words, Murchison argues: "The present sentence is . . . greater than necessary . . . ."  *Id.* at 7.

But, as the government points out, defendant's characterization of his offense minimizes the severity of his crime.  Indeed, "drug shops like the one the defendant participated in, and the

poison they distribute, are a substantial source of death in Maryland."  ECF 550 at 14.  Further, the government notes that in entering the C Plea, Murchison acknowledged "that it was foreseeable to him" that the conspiracy involved more than three kilograms of heroin and that he "maintained premises for the purpose of manufacturing or distributing a controlled substance."  *Id.*

Moreover, defendant has only served approximately 37.5% of the 120-month sentence that this Court initially imposed, which was the minimum sentence that the Court could have imposed. *See* ECF 492; ECF 431, ¶ 99.  Indeed, the sentence was at the bottom of the C Plea range (ECF 302, ¶ 8), and far below the sentencing range contemplated by the Guidelines.  ECF 431, ¶ 100. And, although defendant's medical conditions may render him eligible for compassionate release, defendant's vaccination status certainly undercuts the assertion that the continued circulation of COVID-19 has effectively transformed his incarceration into a "death sentence."  ECF 516 at 6.

Defendant's extensive criminal history also militates against his release.  As detailed above, even if Murchison had not qualified as a career criminal offender, his criminal history category would have remained a VI, in light of his numerous prior criminal offenses.  ECF 431, ¶¶ 44-45.   Indeed, prior to defendant's conviction for the instant offense, defendant had been convicted of a variety of criminal offenses over the span of more than fifteen years, for which he has served several, brief terms of imprisonment.  *See*, *e.g.*, *id.* ¶¶ 31, 33-35, 39, 42. Yet, these prior prosecutions were not sufficient to deter Murchison from engaging in the serious criminal activity that resulted in his current term of incarceration.

On the other hand, in *Pepper v. United States*, 562 U.S. 476, 492 (2011), the Supreme Court recognized that a defendant's post-sentencing conduct "provides the most-up-to-date picture of [a defendant's] 'history and characteristics.'" (Quoting 18 U.S.C. § 3553(a)(1)).  To that end, Murchison maintains that he "has completed several educational programs offered by the BOP;

25

has maintained employment, as well as clear conduct throughout his incarceration."  ECF 516 at 7.

Murchison also states that, "[i]n the event that this motion is granted, [he] will reside with his fiancé . . . in Baltimore Maryland."  *Id.* at 5.  Further, defendant claims that he "has been promised a supervisory position at an 'Assisted Living Home' in Baltimore County."  *Id.* at 5-6.  Moreover, he "also has an offer for a job at the port of Baltimore."  *Id.* at 6.  And, defendant informs the Court that he "has a strong support system which includes his father, mother, two sisters and a brother" who all plan "to assist [him] in all area[s] necessary for his transition back into society."  *Id.*

The Court is heartened to learn that defendant appears committed to his rehabilitation and that he has formulated what seems to be a sound release plan.  But, defendant has not offered the Court any records to corroborate his assertions.  And, in any event, the Fourth Circuit has instructed that "rehabilitation alone cannot serve as a basis for compassionate release."  *Davis*, 2022 WL 127900, at * 1.

As I see it, the severity of the instant criminal offense, defendant's extensive criminal history, and the abbreviated term of incarceration that defendant has served to date, coupled with a balancing of all the sentencing factors outlined in 18 U.S.C. § 3553(a), militates against defendant's release at this juncture.

### IV.   Conclusion

Accordingly, the Release Motion and the Appointment Motion are denied, without prejudice.  An Order follows.

Date: April 19, 2022                              _____/s/_____

                                                 Ellen L.  Hollander
                                                 United States District Judge